UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CITIMORTGAGE, INC.,                    )
                                       )
         Plaintiff,                    )
                                       )
    vs.                                )        Case No. 4:12CV246 CDP
                                       )
CHICAGO BANCORP, INC., et al.,         )
                                       )
         Defendants.                   )

## MEMORANDUM AND ORDER

This is a contract dispute between two players in the secondary mortgage
market. In 2004, plaintiff CitiMortgage, Inc. (CMI) and defendant Chicago
Bancorp, Inc. agreed that CMI would, from time to time, buy residential mortgage
loans from Chicago Bancorp. The agreement required Chicago Bancorp to
repurchase its loans if CMI, in its sole discretion, determined the loans violated the
terms of the agreement. CMI determined that the eleven of the loans at issue in
this lawsuit failed to comply with the agreement. CMI demanded Chicago
Bancorp cure or repurchase the loans, which Chicago Bancorp undisputedly did
not do. CMI then sued Chicago Bancorp, alleging that it breached the contract by
failing to repurchase the eleven loans.

Now before me are the parties' motions for summary judgment. CMI argues
that there are no disputed material facts and it is entitled to judgment as a matter of

law that Chicago Bancorp breached the contract by failing to repurchase the eleven loans.  It seeks damages based on a contractual provision governing the "repurchase price" for a defective loan, as well as its costs.  Chicago Bancorp has itself moved for partial summary judgment on three of the loans.  It contends that those three loans were not defective (and CMI could not have so determined in good faith), so Chicago Bancorp was not obligated to repurchase them.[1]  It also argues that material questions of fact remain about the damage claims related to some of the loans.

I conclude that the undisputed evidence shows that Chicago Bancorp breached the contract by failing to repurchase nine of the eleven loans, and that Chicago Bancorp has failed to show that CMI acted in bad faith when it determined that those nine loans failed to comply with the agreement.  As such, CMI is entitled to summary judgment on those nine loans.  I find there are questions of fact preventing summary judgment on the remaining two loans.  I also find that CMI is entitled to summary judgment on the issue of damages, which should be determined in accordance with the repurchase price under the parties' agreement.  I will deny Chicago Bancorp's motion for partial summary judgment,

---

[1] There are three other claims pending, which Citimortgage added when I permitted it to amend its complaint in July 2013.  The motions before me at this time do not relate to those claims.

as well as CMI's motion to exclude testimony from John Calk, which is moot in light of my other rulings.

## I.   **Background**

CMI buys mortgages that have been originated by approved lenders, including lenders known as "correspondents," under its Loan Purchasing Program. Through the Program, CMI functions as an investor in the secondary mortgage market. CMI in turn resells most of the loans it purchases to the Federal National Mortgage Association (Fannie Mae), the Federal Home Loan Mortgage Corporation (Freddie Mac), and other investors in the secondary mortgage market.

CMI uses a standard contract to purchase residential mortgage loans from loan originators and correspondents. The contract is entitled "Correspondent Agreement Form 200." It expressly incorporates a longer document called the CMI Correspondent Manual, which sets forth more detailed terms and conditions. (*See* Agreement, Doc. 99-3, Pl.'s Ex. B, ¶ B (incorporating the Manual); Docs. 99-4 through 99-10, Pl.'s Ex. C (the Manual).) The Manual, in turn, incorporates Fannie Mae's guidelines and the processing requirements for Fannie Mae's Desktop Underwriter, "an automated underwriting service designed to help lenders make credit decisions by analyzing borrower and property data." (*See* Doc. 1-1, ¶ 2(k); Doc. 99-8, Pl.'s Ex. C, § 2202, pp. 78–80, § 2301, p. 95.) CMI and Chicago

Bancorp entered into a Correspondent Agreement Form 200 on April 12, 2004. Later, they also entered a Delegated Underwriting Addendum and a CMI Select Addendum. These contracts will collectively be referred to as "the Agreement."

Under the Agreement, Chicago Bancorp was required to deliver certain loan documentation to CMI for each loan it sold to CMI. The Agreement gave CMI the right to require Chicago Bancorp to cure or correct any loan that CMI, in its sole and exclusive discretion, determined was defective in one of a number of ways. If Chicago Bancorp was unable to do so, CMI could demand repurchase. Specifically, the "Cure or Repurchase" clause of the Agreement provides, in relevant part:

**CURE OR REPURCHASE**

If CMI, in its sole and exclusive discretion, determines any Loan purchased pursuant to this Agreement:

(i)     was underwritten and/or originated in violation of any term, condition, requirement or procedure contained in this Agreement or the CMI Manual in effect as of the date CMI purchased such Loans;

(ii)     was underwritten and/or originated based on any materially inaccurate information or material misrepresentation made by the Loan borrower(s), Correspondent, Correspondent's directors, officers, employees, agents, independent contractors and/or affiliates, or any other party providing information relating to said Loan; . . .

(iv)  must be repurchased from any secondary market investor . . . due to a breach by Correspondent of any representation, warranty or covenant contained in this Agreement or the CMI Manual or a failure by Correspondent to comply in all material respects with the applicable CMI Manual terms, conditions, requirements and procedures . . . .

Correspondent will, upon notification by CMI, correct or cure such defect within the time prescribed by CMI to the full and complete satisfaction of CMI.  If, after receiving such notice from CMI, Correspondent is unable to correct or cure such defect within the prescribed time, Correspondent shall, at CMI's sole discretion, either (i) repurchase such defective Loan from CMI at the price required by CMI ("Repurchase Price") or (ii) agree to such other remedies (including but not limited to additional indemnification and/or refund of a portion of the Loan purchase price) as CMI may deem appropriate . . . .

(Doc. 99-3, Pl.'s Ex. B, ¶ 11.)

## II.  <u>Challenged Loans</u>

Since 2004, CMI has purchased more than 4,790 mortgage loans from Chicago Bancorp under the Agreement.  Eleven of those loans are at issue in this lawsuit.  Those loans are identified by the parties using the last names of the borrowers: Bennett, Brown, Curtis, Gelatka, Hansen, Maggio, McDonald, Miller, Perez, Villares, and Wade.  The sale of these loans was governed by the Agreement.

After purchasing each of these eleven loans from Chicago Bancorp, CitiMortgage made a determination that the application package for the loan

contained material misrepresentations or that the loan was otherwise defective. Chicago Bancorp contends that most of these determinations were made in bad faith.

CMI demanded that Chicago Bancorp cure the defects in these loans or repurchase them. When Chicago Bancorp did not adequately respond to its demands, CMI filed this case asserting breach of contract. CMI seeks damages in the amount of the "repurchase price" for these loans as that price is calculated in the Agreement. Under section 2301 (the glossary) of the CMI Manual, the Repurchase Price is defined as:

> [T]he sum of (i) the current principal balance on the loan as of the paid-to date; (ii) the accrued interest calculated at the mortgage loan Note rate from the mortgage loan paid-to date up to and including the repurchase date; (iii) all unreimbursed advances (including but not limited to tax and insurance advances, delinquency and/or foreclosure expenses, etc.) incurred in connection with the servicing of the mortgage loan; (iv) any price paid in excess of par by CitiMortgage on the funding date; and (v) any other fees, costs, or expenses charged by or paid to another investor in connection with the repurchase of the mortgage loan from such investor but only to the extent such fees, costs and expenses exceed the total of items (i) through (iv) above.

(Doc. 99-8, Pl.'s Ex. C, p. 97). CMI calculates the total repurchase price of the eleven loans at issue to be $1,866,530.49. (Doc. 97, Pl.'s Mot. for Summ. J., p. 3.)

## III.  Summary Judgment Standard

The summary judgment standards do not change when both parties have moved for summary judgment.  *See Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983).  In determining whether to grant either party's motion, the court views the facts – and any inferences from those facts – in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The movant bears the burden of establishing that (1) it is entitled to judgment as a matter of law and (2) there are no genuine issues of material fact.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  Once the movant has met this burden, however, the non-moving party may not rest on the allegations in its pleadings but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(e).  Where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmovant, there is no genuine issue for trial.  *Matsushita*, 475 U.S. at 587.

## IV.  The Covenant of Good Faith and Fair Dealing

The Agreement provides that Missouri law applies.  Under Missouri law, CMI can only prevail on its claim for breach of contract if it proves: (1) the existence of a valid contract between it and Chicago Bancorp; (2) Chicago

Bancorp's obligations under the contract; (3) Chicago Bancorp's breach of that obligation; and (4) resulting damages. *See, e.g., C-H Bldg. Assocs., LLC v. Duffey*, 309 S.W. 3d 897, 899 (Mo. Ct. App. 2010). Here, Chicago Bancorp does not dispute the existence of the Agreement with CMI or that it had obligations under that Agreement. Instead, Chicago Bancorp disputes that it breached its contractual obligations by refusing to cure or repurchase the loans when, it contends, CMI's determinations that the loans were defective were made in bad faith.

In interpreting a contract under Missouri law, a court's primary consideration is "to ascertain the intent of the parties and then give effect to that intent." *Lueckenotte v. Lueckenotte*, 34 S.W.3d 387, 395 (Mo. banc 2001) (internal citations and quotation marks omitted). If no ambiguities exist in the contract, the court is to gather the parties' intent from the contract itself, giving the contract's terms their plan and ordinary meaning. *Id.* Here, no one disputes that the plain meaning of the Agreement's Cure or Repurchase provision unambiguously gave CMI sole and exclusive discretion to determine whether loans were defective for any of the reasons enumerated in the Agreement.

In cases where a contract gives one party discretion to determine issues arising under the contract, Missouri law requires that party to exercise its discretion in good faith, consistent with the covenant of good faith and fair dealing implied in

every contract.  *See, e.g., Mo. Consol. Health Care Plan v. Cmty. Health Plan*, 81

S.W.3d 34, 48 (Mo. Ct. App. 2002); *see also, e.g., Farmers' Elec. Coop., Inc. v.*

*Mo. Dep't of Corr.*, 977 S.W.2d 266, 271 (Mo. banc 1998).  The duty of good faith

encompasses "an obligation imposed by law to prevent opportunistic behavior, that

is, the exploitation of changing economic conditions to ensure gains in excess of

those reasonably expected at the time of contracting."  *Schell v. Lifemark Hosps. of*

*Mo.*, 92 S.W.3d 222, 230 (Mo. Ct. App. 2002).

   But the covenant does not create a general reasonableness requirement in

contracts, and it is not enough "to show that a party invested with discretion made

an erroneous decision."  *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 914

(8th Cir. 2007) (interpreting Missouri law); *see also, e.g., Schell*, 92 S.W.3d at

230–31 ("Reasonableness does play a role in the good faith analysis – but only as

evidence of subjective intent to undermine fulfillment of the contract.").

   Instead, to establish a breach of the covenant of good faith and fair dealing,

there must be evidence that a party exercised its discretion in such a way so as to

evade the spirit of the transaction or deny the other party the expected benefit of

the contract.  *See, e.g., BJC*, 478 F.3d at 914; *see also Cordry v. Vanderbilt Mortg.*

*& Fin,. Inc.*, 445 F.3d 1106, 1112 (8th Cir. 2006) ("When a decision is left to the

discretion of one party, the question is not whether the party made an erroneous

– 9 –

decision but whether the decision was made in bad faith or was arbitrary or capricious so as to amount to an abuse of discretion.").

Therefore, under Missouri law, Chicago Bancorp was required to cure or repurchase the loans at issue as long as CMI made a good-faith determination that they were defective. Even CMI's mistaken belief that the loans failed to comply with the agreement would not be sufficient evidence of bad faith for Chicago Bancorp to defeat CMI's motion for summary judgment. *See, e.g., Schell*, 92 S.W.3d at 230–31 (citing *Rigby Corp. v. Boatmen's Bank & Trust Co.*, 713 S.W.2d 517, 526 (Mo. Ct. App. 1986) (defendant acted in good faith when "he acted on what he believed he knows, whether or not what he believed was true or reasonable to believe")). In addition, there can be no bad faith if CMI simply performed the actions expressly granted it by the parties' agreement, including determining that loans were defective and needed to be repurchased. *See St. Joseph v. Lake Contrary Sewer Dist.*, 251 S.W.3d 362, 371 (Mo. Ct. App. 2008); *Yarborough v. DeVilbiss Air Power, Inc.*, 321 F.3d 728, 733 (8th Cir. 2003) (interpreting Arkansas law and holding that "in no situation can the implied covenant of good faith and fair dealing limit the way in which a party exercises its discretion when the aggrieved party has specifically disavowed any limitations on that discretion, and the exercise of that discretion (and its consequences) are easily foreseeable").

Although it is true that the agreement gave CMI sole discretion to demand repurchase if it determined the loans were defective, it did not give CMI sole discretion to demand repurchase for no reason at all. *Cf. St. Joseph*, 251 S.W.3d at 371–72. Instead, the agreement required CMI to determine first that there was a defect in the loan. Accordingly, I have reviewed below the evidence with respect to each of the eleven loans. Contrary to Chicago Bancorp's repeated assertions, it is Chicago Bancorp's burden to present evidence of CMI's bad faith, not CMI's burden to present evidence of its own good faith. *See Acetylene Gas Co. v. Oliver*, 939 S.W.2d 404, 410 (Mo. Ct. App. 1996); *First State Bank of St. Charles, Mo. v. Frankel*, 86 S.W.3d 161, 175 (Mo. Ct. App. 2002) (*overruled on unrelated grounds by Badahman v. Catering St. Louis*, 395 S.W.3d 29 (Mo. banc 2013)).

CMI argues that Chicago Bancorp should be precluded from asserting a bad-faith defense because Chicago Bancorp itself acted in bad faith. CMI contends that under the Agreement, Chicago Bancorp expressly warranted that it was solvent and would immediately notify CMI if it "incurred or is likely to incur a material adverse change in its . . . financial condition." (Doc. 99-3, Pl.'s Ex. B, ¶ 2.) According to CMI, there is "ample evidence" that Chicago Bancorp has breached these warranties, which conclusively establishes Chicago Bancorp's bad faith. Although Chicago Bancorp's conduct with respect to the Agreement may be

relevant to its defenses, I will not at this stage bar Chicago Bancorp from attempting to prove that CMI acted in bad faith when it determined the loans were defective.

## V.    Evidence on Challenged Loans

### Bennett loan

CMI has submitted undisputed evidence showing that it purchased the Bennett loan from Chicago Bancorp, then resold the loan to Fannie Mae. Fannie Mae determined that Bennett had misrepresented his income on his loan application by including a position (and its attendant income) that he in fact did not hold. (*See, e.g.,* Doc. 99-12, Pl.'s Ex. E1, p. 1.) After removing the offending income, Bennett's debt-to-income ratio rose to 91.16%, which exceeded the allowable ratio under the applicable loan program. (*See* Docs. 99-16 and 99-18, Pl.'s Exs. E5, p. 3 and E7, p. 1.) Fannie Mae compelled CMI to repurchase the loan, which it did. CMI then sent demand letters to Chicago Bancorp, which refused to repurchase the loan. Summary judgment for CMI is appropriate on the Bennett loan.

### Brown loan

On May 7, 2007, CMI purchased from Chicago Bancorp the Brown loan through a "stated income" loan program. To be eligible for purchase by CMI

through a stated income loan program, a loan application package originated by Chicago Bancorp could not include a third-party verification of income. (*See* Doc. 99-29, Pl.'s Ex. F5, p. 4 (Program 252 description).) Sometime after purchasing the loan, CMI determined that the loan application package substantially misrepresented Brown's income.[2] After substantiating Brown's actual income, CMI also determined that the debt-to-income ratio for the Brown loan had exceeded the limit under the Agreement. (*See* "Qualifying Ratios," *id.*, p. 3.)[3] In 2010, CMI sent letters to Chicago Bancorp demanding repurchase based on the misrepresented income and debt-to-income ratio, which Chicago Bancorp resisted.

Chicago Bancorp does not dispute that the loan application misrepresented Brown's income. But it argues that the Agreement only requires repurchase for material misrepresentations, and CMI did not make a good-faith determination that the misrepresentation of the borrower's income was material. To support this contention, Chicago Bancorp points out that under the stated income loan programs, correspondent banks were prohibited from verifying the borrower's stated income. Chicago Bancorp concedes that it may have been "outrageously

---

[2] According to the loan application package and demand letters submitted by CMI and not refuted by Chicago Bancorp, Brown's represented gross monthly income was $8,646 at the time of closing. An audit later showed that Brown's monthly income was actually only $2,480.10 per month.

[3] The "CMI Manual in effect as of the date CMI purchased" each loan is incorporated under the Agreement. The Manual excerpts in CMI's exhibits appear to be the correct versions, and Chicago Bancorp has not disputed their applicability.

stupid" to originate or purchase a loan without substantiating the borrower's income, but argues that CMI must have considered borrower income immaterial or it would not have purchased loans at all through a stated income loan program.

Chicago Bancorp also points to deposition testimony from Jeffrey Polkinghorne, who worked as CMI's chief credit officer in 2004. Polkinghorne testified that a study had been done under his direction to determine whether CMI should initiate "Alt-A" programs,[4] which included purchase of stated income loans. Through the study, CMI concluded that not verifying the income of certain borrowers did not make a material difference to the performance of their loans, and the company therefore initiated Alt-A programs. Polkinghorne stated that he was aware that some borrowers would lie about their income under a stated income program. He testified that CMI was still "able to manage the risk of [the borrowers] stating their income without verifying their income . . . ." (Doc. 129-47, Def.'s Ex. P, Polkinghorne Dep. 30:13-15.) Further, he stated, sometimes borrowers misrepresented their income under verified income programs by using

_____

[4] Polkinghorne explained that an "Alt-A" program is an alternative lending program for "A" (prime) borrowers, who have good credit and substantial assets. Alt-A programs include "stated income, verified assets" (SIVA) loans, "stated income, stated assets" (SISA) loans, and loans with expanded criteria, such as those permitting a higher-than-usual loan-to-value percentage.

manufactured pay stubs and tax returns, and CMI also took this into consideration in deciding to initiate the Alt-A programs.[5]  (*Id.* 30:17–23.)

In addition, Chicago Bancorp relies on deposition testimony by its president, John Calk, who stated that CMI representatives expressly told him "on multiple occasions that income and sourcing that income was not material to the performance of the loan so don't get it in the loan files."  (Doc. 129-53, Def.'s Ex. T, Calk Dep. 278:5-8.)  Calk testified that based on his experience in the home lending industry, he knows that if a factor is material to a secondary mortgage investor, it will require that factor to be verified in the underwriting process.  (*E.g., id.*, 215:15–216:7; 276:5-16.)

Finally, in support of its contention that Brown's misrepresented income was not a material misrepresentation, Chicago Bancorp points to the fact that CMI did not flag Brown's income as suspect during its pre-purchase review of the Brown loan – though it did issue a suspense notice that Brown had neglected to check a box indicating his ethnicity.  Chicago Bancorp concedes that, under the Agreement, "CMI's review of, or failure to review, all or any portion of the Loan

---

[5]  Chicago Bancorp attempted, through discovery, to get the documents and other information related to the Polkinghorne study and his recommendation to initiate the Alt-A programs, but CMI's counsel and corporate representative stated that they were unable to find them.  Chicago Bancorp argues that CMI has not explained the disappearance and has stonewalled its attempts to get the information it requested.  For the reasons stated below, whether or not the study or information about it was improperly withheld is not relevant.

documentation shall not affect CMI's rights to demand repurchase . . . ." (Agreement, Doc. 99-3, Pl.'s Ex. B, ¶ 1.) But it argues that CMI's failure to notice Brown's stated income was substantially higher than his job would be expected to generate (based on its title) is "one more piece of evidence that CMI didn't consider borrower income to be material to its loan purchase decisions" under the stated income loan programs.

None of Chicago Bancorp's evidence is sufficient to defeat CMI's motion for summary judgment as to the Brown loan. Chicago Bancorp apparently does not dispute that the debt-to-income ratio – when calculated based on the borrower's actual income – far exceeded the applicable guidelines under the Agreement. The CMI Manual permitted a debt-to-income ratio up to 45%, but Brown's true debt-to-income ratio was 92.32%. The debt-to-income ratio alone permitted CMI to demand cure or repurchase because the loan violated a requirement contained in the CMI Manual. (*Id.* ¶ 12; Doc. 99-29, Manual Sect. 252, Pl.'s Ex. F5, p. 3.) As the Agreement unambiguously provides, CMI was not required to discover the offending debt-to-income ratio when it conducted its pre-purchase review, especially because the violation was not apparent from the face of the loan application.

As for the materiality of Brown's misrepresented income, I agree with prior decisions in this court that "a borrower's substantially misrepresented income constitutes a material misrepresentation as a matter of law." *E.g.*, *CitiMortgage v. Allied Mortg. Grp., Inc.*, 2012 WL 5258745, 4:10CV1863 JAR, at *13 (E.D. Mo. Oct. 24, 2012) (internal quotation marks omitted). Under Missouri law, "a misrepresentation is deemed material where it is reasonably calculated to affect the action and conduct of the company in deciding whether or not to accept the risk by issuing its policy covering the risk." *Cont'l Cas. Co. v. Maxwell*, 799 S.W.2d 882, 889 (Mo. Ct. App. 1990) (interpreting insurance policy). Even under CMI's stated income loan programs, a borrower must provide his income subject to civil and criminal penalties. (*See, e.g.,* Doc. 99-2, Pl.'s Ex. A, ¶ 44; Doc. 99-27, Pl.'s Ex. F3, p. 4.) Income is one of the two factors used to calculate a debt-to-income ratio. The Manual indicates that CMI will not purchase a loan unless the debt-to-income ratio falls within a certain limit. Because borrower income is crucial to determining the debt-to-income ratio, its substantial "misrepresentation is of such a nature that all minds would agree it is" material. *Maxwell*, 799 S.W.2d at 889. Therefore, "the materiality of a misrepresentation is so clear that it should be declared material as a matter of law." *Id.*

All of Chicago Bancorp's evidence relating to the materiality of borrower income actually goes to whether third-party *verification* of a borrower's income was material to CMI's decision to purchase stated income loans. None of the evidence tends to show that Brown's income *itself* was immaterial to CMI's decision to purchase the Brown loan. Instead, as CMI points out, the borrower's represented income was simply "the means by which the borrower's income is determined in a Stated Income Loan." (Doc. 141, Pl.'s Reply in Support of Mot. for Summ. J., p. 4.)

Whether it was smart or reasonable to rely on the loan application package alone, without separately documenting a borrower's income, does not evidence CMI's bad faith in later determining that the Brown loan contained a material misrepresentation. Although the reasonableness of a party's conduct can be relevant to a determination of good faith, the demands of reasonableness are limited by the parties' "*purposes* in contracting." *Schell*, 92 S.W.3d at 231 (emphasis in original). As such, the reasonableness of CMI's conduct – in not verifying borrower income before purchase – must be taken in light of the whole Agreement. The Agreement gave CMI sole and exclusive discretion to require repurchase for material misrepresentations and thereby protected it, in large part, from the risk of purchasing a stated income loan where the borrower inflated his

income and then defaulted as a result. Though Chicago Bancorp has amply documented how this arrangement left an originating bank vulnerable to this same risk, it has not provided any evidence that CMI's conduct somehow denied Chicago Bancorp the expected benefit of the contract. Instead, all the admissible evidence provided by Chicago Bancorp shows that CMI acted precisely in accordance with the Agreement. *See St. Joseph*, 251 S.W.3d at 371.

John Calk's testimony does not support Chicago Bancorp's argument that Brown's misrepresented income was not material to CMI. Like the other evidence, the conversations Calk reported between himself and CMI representatives tend to show CMI did not consider verification of borrower income, rather than the income itself, to be material.

Calk also testified, based on his experience in the home lending industry, that borrower income could not be material to CMI because CMI had not insisted upon its verification by a third party. Missouri law defining materiality does not support Calk's opinion that a representation is only material if it is verified by a third party. For example, an insurer is entitled to rely upon a representation made by an applicant and is not estopped from denying coverage if it later discovers a falsehood. *Moreland v. State Farm Fire & Cas. Co.*, 662 S.W.2d 556, 566 (Mo. Ct. App. 1983) ("We are mindful that where answers in an application for

insurance are complete on their face, the insurer is not obliged to make further inquiry, and absent knowledge of the true facts is not estopped to avoid the policy."). Precedent finding various misrepresentations were material does not mention third-party substantiation as a factor, even in cases where such verification would have been easy to obtain. *See, e.g., Central Bank of Lake of the Ozarks v. First Marine Ins. Co.*, 975 S.W.2d 222, 224 (Mo. Ct. App. 1998). Instead, under Missouri law, the test of materiality is whether the answer, if truthful, might reasonably have influenced an insurer (or in this case, an investor) to reject a risk or charge a higher premium (or interest rate). *Coots v. United Empl'rs Fed'n*, 865 F. Supp. 596, 603 (E.D. Mo. 1994) (citations omitted). Brown's truthful answer would have rendered his debt-to-income ratio ineligibly high under CMI's guidelines. *Compare Central Bank*, 975 S.W.2d at 224 (man's failure to disclose that his son was part-owner of a boat, where son's driving record made him ineligible for boat insurance under insurer's guidelines, was material misrepresentation as a matter of law). In light of Brown's unacceptably high debt-to-income ratio, Calk's testimony is not sufficient evidence of CMI's bad faith to preclude summary judgment on the Brown loan.

### *Curtis loan*

After purchasing the Curtis loan from Chicago Bancorp, CMI found out that the borrower had not been working at her reported place of employment when she closed on the loan or for more than a year afterward. When CMI calculated the borrower's debt-to-income ratio using solely her alternate income, without taking into account the falsely reported employment income, it increased from 64.44% to 174.84%. In addition, the borrower relied in part on her child support income in making the loan. CMI found that the loan file did not contain documentation verifying three months of child support had been received, as required. CMI demanded Chicago Bancorp repurchase the loan, which it has not done.

Chicago Bancorp does not dispute that the Curtis loan application misrepresented the borrower's place of employment and income, and as a result, her debt-to-income ratio exceeded the allowed limit. Instead, it argues that as of May 4, 2007, it discontinued underwriting the loans it originated for sale to CMI. From that date on, it paid an underwriting fee to CMI, which hired a contract agency to underwrite the loans. Chicago Bancorp contends that verifying Curtis' employment and income was the underwriter's responsibility, not the responsibility of Chicago Bancorp as originator. It considers CMI responsible for the contract underwriter's failure to catch the income misrepresentation, and it

points to Missouri law holding that a contract will not be construed to indemnify a party for damages resulting from its own negligent acts unless the contract is "clear and unequivocal."

In this case, however, the contract is clear and unequivocal. It provides for cure or repurchase if CMI, "in its sole and exclusive discretion, determines that any Loan purchased pursuant to this Agreement: . . . was underwritten *and/or originated* based on any materially inaccurate information or material misrepresentation." (Doc. 99-3, Pl.'s Ex. B, ¶ 11(i) (emphasis added).) Chicago Bancorp does not dispute that it originated the Curtis loan based on materially inaccurate information. CMI is entitled to summary judgment on the Curtis loan.

### *Gelatka loan*

CMI purchased the Gelatka loan from Chicago Bancorp, then resold the loan to Fannie Mae. After Fannie Mae sustained a loss on the loan, it demanded repurchase from CMI. Although CMI initially protested, it ultimately repurchased the loan from Fannie Mae. It then demanded Chicago Bancorp repurchase the Gelatka loan. Fannie Mae and CMI both determined the loan was defective because the borrower's income was inadequately documented. Specifically, the borrower had been employed for only three months at the time he filled out his

loan application; his income was $3,750 per month.  During the two years before that, the borrower had worked at other jobs, been unemployed, and been in school.

In a demand letter to Chicago Bancorp, a CMI employee wrote that under Fannie Mae guidelines, incorporated into the Agreement, a borrower must have a two-year employment history and a reasonable expectation that income will continue for at least three years.  The employee continued, "In this case, the lender's verbal verification of employment did not indicate the probability of continued employment with current employer.  Furthermore, the borrower did not have a documented two-year employment history . . . [which] rendered the subject mortgage ineligible for delivery to Fannie Mae."  (Doc. 99-53, Pl.'s Ex. H7, p. 1.)

But the applicable Fannie Mae guidelines – at least, those that have been provided to this court – are ambiguous.  The guidelines do state that Fannie Mae "require[s] the lender to obtain two years of documentation for a borrower's employment and income history."  But two paragraphs before that, the guidelines also state:

> We have no minimum history for a borrower's receipt of income–as long as the lender can determine that the borrower's income is stable, predictable, and likely to continue.  In general, unless there is evidence that the income will no longer be received, the lender should assume that it will continue.

(Doc. 99-50, Pl.'s Ex. H4, p. 10.)  Though it eventually acquiesced, CMI initially

protested Fannie Mae's decision to require repurchase, which Chicago Bancorp

argues is evidence that its determination that the loan was defective was not made

in good faith.  (*See* Doc. 129-73, Def.'s Ex. MM, p. 1.)[6]

I conclude that this evidence raises a genuine dispute of material fact

precluding summary judgment.  CMI contends that it is entitled to summary

judgment on the Gelatka loan because the loan is defective in multiple ways:

inadequate income documentation, a debt-to-income ratio that exceeded applicable

guidelines, and because it was required to repurchase the loan from Fannie Mae.

However, under the terms of the Agreement, CMI could only compel Chicago

Bancorp to repurchase a loan sent back from Fannie Mae if the defect was "due to

a breach by Correspondent of any representation, warranty or covenant contained

in this Agreement or the CMI Manual or a failure by Correspondent to comply in

all material respects with the applicable CMI Manual terms, conditions,

requirements and procedures."  (Doc. 99-3, Pl.'s Ex. B, ¶ 11(iv).)  Therefore, to

require repurchase under this provision of the Agreement, CMI must have

---

[6]  In relevant part, CMI wrote to Fannie Mae: "CMI has reviewed Fannie Mae's request for
repurchase due to the income being inadequately documented and disagree with Fannie Mae.
[Desktop Underwriter] condition # 14 required a pay stub dated within 30 days and a w2 from
the prior year. The DU required documentation was provided to satisfy the condition. In
addition, the borrower provided a letter of explanation regarding their prior job history in which
it evidences the borrower did have a 24-month job employment history in [the same field]."

determined in good faith that Chicago Bancorp had not complied with the

Agreement or the Manual. Under the ambiguous requirements of the Fannie Mae

guidelines, which I must construe against CMI, *see Triarch Indus., Inc. v.

Crabtree*, 158 S.W.3d 772, 776 (Mo. banc 2005), I cannot find as a matter of law

that Chicago Bancorp inadequately documented Gelatka's income.

Further, factual disputes remain regarding whether Gelatka's debt-to-income

ratio exceeded the guidelines. The CMI Manual provides that, to be eligible under

the "My Community Mortgage" program, a borrower may have a "Total

Obligations Ratio" of up to 43% "or as approved using [Desktop Underwriter]."[7]

(*Id.*) The Manual goes on, "[t]his ratio may be exceeded on a case-by-case basis

provided the proposed housing expense is equal to or less than what the borrower

had been paying and they were able to maintain a good credit history while paying

a similar amount for housing in the past." (*Id.*) In addition, the Manual provides

that the ratio is "not applicable for loans run through DU that receive an

Approve/Eligible, EAI/Eligible or EAII/Eligible finding as long as the loan meets

all other eligibility criteria." (*Id.*) CMI has stated that Gelatka's debt-to-income

ratio was too high, but it has not produced evidence of what that ratio was, or that

---

[7] Although neither party states expressly that the Gelatka loan was underwritten using Desktop Underwriter, references to "DU" make clear that it was. (*See, e.g.,* Doc. 129-73, Def.'s Ex. MM.)

it failed to meet the alternative measures listed in the Manual.  I will deny summary judgment with regard to this loan.

### *Hansen loan*

The Hansen borrowers filled out their loan application on November 27, 2006, asserting (truthfully) that Mr. Hansen worked as a network engineer at a tech company and earned $7,750 per month.  Two weeks later, Mr. Hansen accepted a similar position with a different company, where he would earn approximately the same amount of money.  His last day at the old company was Friday, December 22, 2006, though – because of a payment arrangement with the company – he was paid for a week after that.  The following Monday, December 26, 2006, the Hansen borrowers closed on their loan, signing the application without changing the information about Mr. Hansen's salary or employer.  On December 28, 2006, Mr. Hansen received his last paycheck from the old company; on January 2, 2006, he started at the new company.  He apparently worked at the new company for 45 days, then stopped working for two months before beginning work elsewhere. (*See* Doc. 141-5, Pl.'s Ex. 5 to Reply, Hansen Dep. 32:12-21.)  Mr. Hansen testified in a deposition that he had defaulted on his mortgage loan in part because of this two-month period of unemployment, which depleted his family's savings. (*Id.* 36:5-18.)

CMI purchased the Hansen loan from Chicago Bancorp at closing. When the loan later went into default, CMI demanded Chicago Bancorp repurchase the loan based on Mr. Hansen's December 26 misrepresentation that he was still employed at the old company, making his old salary.

Chicago Bancorp argues that the misrepresentation was not "material" under its agreement with CMI because Mr. Hansen continued – throughout 2007 and 2008 – to earn approximately the same salary. Chicago Bancorp contends that CMI could not have determined in good faith that the representation was material because it was in regular contact with the Hansens after closing and could have asked Mr. Hansen if he was still employed.

Although a substantial misrepresentation of a borrower's income is material as a matter of law, materiality is generally a question of fact. *Continental Cas. Co.*, 799 S.W.2d at 889. But even if a genuine factual dispute remains regarding whether the Hansen misrepresentation was material, CMI has presented uncontroverted evidence that *it determined* that the Hansen misrepresentation was material. CMI's apparent failure to ask Mr. Hansen for updated employment information during and after default could have had no bearing on the materiality of his misrepresentation at the time of closing. *See Weekly v. Mo. Prop. Ins. Placement Facility*, 538 S.W.2d 375, 378 (Mo. Ct. App. 1976) ("That the fact

misrepresented has no subsequent relation to the manner in which the event insured against occurred, does not make it any the less material to the risk."). Because Chicago Bancorp has not provided any evidence of CMI's bad faith, CMI is entitled to summary judgment on the Hansen loan.

### *Maggio loan*

CMI purchased the Maggio loan from Chicago Bancorp and later determined that the loan application substantially misrepresented Maggio's income. The borrower stated that she made $8,291 per month when she actually earned $4,005 per month.[8] Under the applicable guideline in the CMI Manual, Maggio was eligible for a loan if she had a debt-to-income ratio under either 45% or 50% (depending on whether it was a fixed- or adjustable-rate mortgage). When CMI recalculated Maggio's debt-to-income ratio using the correct income, it rose to 89%. Because the loan violated the debt-to-income ratio requirement contained in the CMI Manual and contained a material misrepresentation (namely, the substantial inflation of the borrower's income), the undisputed evidence shows that the loan was defective under the Agreement.

---

[8] Although CMI represented that this was the borrower's verified income in its demand letters to Chicago Bancorp, the written verification statement gives inconsistent amounts for Maggio's 2007 annual salary and her gross biweekly salary. (*See* Doc. 99-73, Pl.'s Ex. J4.) It may be that her income increased in 2008, after she closed on her mortgage loan. Regardless of which figure is used, Maggio's true income was substantially less than what she represented.

In support of its position that it was not required to repurchase the Maggio loan, Chicago Bancorp advances the same arguments as it did for the Brown and Curtis loans. For the reasons stated above, those arguments must fail. Summary judgment for CMI is appropriate on the Maggio loan.

## *McDonald loan*

After purchasing the McDonald loan from Chicago Bancorp, CMI determined that the loan package was defective in two respects: (1) it did not contain required information verifying the borrowers' employment, income, and assets and (2) the borrowers had not chipped in at least $500 of their own money when closing on the loan. Under the CMI Manual guidelines, an applicant for this type of loan – the Fannie Mae DU Expanded Approval loan – was required to "contribute a minimum of 3% of his/her own funds toward the down payment and closing costs" unless the loan met certain conditions. If the loan received a certain type of recommendation from the Desktop Underwriter and carried a certain loan-to-value ratio, a borrower could put in $500 of his or her own funds instead of meeting the 3% threshold. (*See* Doc. 99-84, Pl.'s Ex. K5, p. 4.) The Fannie Mae guidelines provide further:

> The deposit on the sales contract for the purchase of the security property is an acceptable source of funds for both the down payment and the closing costs. When the deposit is used to make any portion of the borrower's down payment that must come from his or her own

– 29 –

funds, the source of funds for the deposit must be verified. The receipt of the deposit generally should be verified by a photocopy of the borrower's canceled check, although a written statement from the holder of the deposit is acceptable.

(*Id.*, p. 7.)

Both CMI and Chicago Bancorp have moved for summary judgment on this loan. Chicago Bancorp contends that the loan file contained the verifications required under the Agreement, including a canceled personal check substantiating the McDonalds' required contribution, and has submitted an affidavit from its former president, John Calk, to this effect. (*See* Doc. 61-4, Def.'s Ex. A, ¶ 5.) It has also provided copies of the documents themselves. Finally, Chicago Bancorp points out that CMI did not issue a suspense notice about the missing documentation when it conducted its pre-purchase review, which it contends is evidence that the documents were actually there.

Because Chicago Bancorp and CMI agree on what was required to document the borrowers' income, but dispute whether those documents were present in the loan file, there are issues of fact preventing summary judgment for either party. A jury could view Chicago Bancorp's evidence as supporting a finding of bad faith.

CMI argues that Chicago Bancorp is precluded from raising a bad-faith defense as to the McDonald loan because it ignored demand letters from CMI, which gave Chicago Bancorp an opportunity to provide the substantiating

documents before now.  CMI cites no law in support of this contention, which does not seem to have any basis in the Agreement between the parties.  Although Chicago Bancorp's failure to respond to the letters may be relevant to the fact issue of whether CMI acted in bad faith, it does not bar Chicago Bancorp from using a bad-faith defense.

CMI also argues that the McDonald loan suffered from an additional defect: CMI was required to repurchase the loan from Fannie Mae, the secondary investor to which CMI had sold the loan.  This is a derivative defect; it only requires repurchase by Chicago Bancorp if Fannie Mae's rejection of the loan was caused by Chicago Bancorp.  The parties agree that Fannie Mae dropped the loan because it lost its insurance coverage and that the insurer rescinded coverage because of the supposedly missing documents.  It remains a question of fact whether the documents were missing because Chicago Bancorp never provided them or because CMI lost them.  Neither party is entitled to summary judgment as to this loan.

### *Miller loan*

CMI purchased the Miller loan from Chicago Bancorp and resold it to Fannie Mae, which determined that the sellers had made excessive contributions to the buyers at closing in violation of Fannie Mae guidelines.  The evidence

submitted by CMI suggests that no more than 3% of the loan's total value could be funded by the sellers. (*See* Doc. 99-96, Pl.'s Ex. L6 (Miller loan was second home with CLTV of 95%); Doc. 99-95, Pl.'s Ex. L5 (CMI Manual guidelines providing that sellers' maximum contribution for second homes with CLTVs of greater than 90% is 3%)). CMI sent multiple letters to Chicago Bancorp demanding repurchase. (*See* Docs. 99-91, 99-92, and 99-98, Pl.'s Exs. L1, L2, and L8.) Chicago Bancorp has not repurchased the Miller loan and does not dispute CMI's finding of excessive seller contributions. Therefore, CMI is entitled to summary judgment on the Miller loan.

### *Perez loan*

CMI purchased the Perez mortgage loan from Chicago Bancorp, then sold it to Fannie Mae. Perez had closed on his loan on November 18, 2006, without disclosing the fact that he had two additional mortgages to pay monthly. In 2010, Fannie Mae discovered the extra mortgages when it obtained Perez's credit report. It demanded repurchase from CMI, stating that the "undisclosed mortgages resulted in a misrepresentation of the borrower's financial condition and unacceptable additional layering of risk." (Doc. 99-109, Pl.'s Ex. M6.) When Perez's debt-to-income ratio was recalculated including the mortgages, it rose from 49.55% to 67.78%. (Doc. 99-110, Pl.'s Ex. M7.) CMI eventually complied with

Fannie Mae's repurchase demand, then sent demand letters of its own to Chicago Bancorp based on the same defects.

CMI argues that Chicago Bancorp was obligated under the Agreement to repurchase the loan because: (1) the missing mortgages amounted to a material misrepresentation; (2) the properly calculated debt-to-income ratio exceeded applicable guidelines incorporated into the Agreement; and (3) Fannie Mae compelled CMI to repurchase the loan because of the other two defects.

First, the record contains insufficient evidence for me to determine whether the new debt-to-income ratio was excessive for this type of loan. Perez's mortgage was a cash-out refinance called an "Agency SISA" loan. The relevant portion of the CMI Manual provides that "[t]he debt ratio is determined by DU." (*See* Doc. 99-108, Pl.'s Ex. M5, pp. 3, 4.) The DU (Desktop Underwriter) guidelines in turn refer to require a lender to resubmit a loan to DU if the lender discovers the borrower failed to disclose a debt "if the monthly payment will increase the total expense ratio by more than 2 percentage points." (*Id.*, pp. 7–8.) But CMI has not provided any evidence showing whether the lender[9] complied with this requirement and whether DU re-approved the loan at the higher debt-to-income ratio.

---

[9] Whether "lender" refers to Chicago Bancorp or CMI is unclear. The portion of the DU guidelines provided to the court do not define the term "lender."

However, Perez's omission of the two additional mortgages could violate the Agreement even if their inclusion did not lead to an excessive debt-to-income ratio. Whether they did depends on whether Perez's misrepresentation of his debts was "material" to CMI's decision to purchase the loan. Chicago Bancorp argues that it was not a material misrepresentation because Perez successfully made payments on the subject loan until after he had sold and paid off the undisclosed mortgages. As evidence that CMI agrees, it has submitted a letter from CMI to Fannie Mae, protesting Fannie Mae's decision to require CMI to repurchase the Perez loan. In the letter, a CMI employee writes:

> After a detailed review [of] the documentation provided and the loan file, it is concluded that this claim is immaterial and has no material adverse [e]ffect to the subject loan. Fannie Mae's updated credit report reflects the additional mortgages are paid off with satisfactory payment history. The borrower was able to maintain both payments and pay the subject loan in a timely manner. . . . The undisclosed liabilities had no impact on the borrower's ability to pay back the subject loan.

(Doc. 129-71, Def.'s Ex. KK.)

I conclude that, like a substantial misrepresentation of a borrower's income, a substantial misrepresentation of a borrower's debt is material as a matter of law. In this case, the undisclosed mortgages alone represented almost one-fifth of

Perez's monthly income, which is a significant amount.[10]  Although Chicago

Bancorp argues that the successful payoff of the undisclosed loans renders the

misrepresentation immaterial, I disagree.  What matters is whether the

misrepresentation was material at the time of purchase, not whether it actually

turned out to increase CMI's risk later.  *See Galvan v. Cameron Mut. Ins.*, 733

S.W.2d 771, 773 (Mo. Ct. App. 1987); *Haynes v. Mo. Prop. Ins. Placement

Facility*, 641 S.W.2d 497, 499 (Mo. Ct. App. 1982); *Weekly*, 538 S.W.2d at 378.

Because Chicago Bancorp originated the loan based on materially inaccurate

information, CMI was entitled to demand repurchase.  CMI is entitled to summary

judgment that Chicago Bancorp breached the Agreement by failing to repurchase

the Perez loan.

### *Villares loan*

Villares, a surgeon in Arizona, closed on a mortgage loan on June 18, 2007.

He represented that he was employed as a "cardiologist/general surgeon" and his

employer was Sunwest Employer Services.  CMI bought the loan from Chicago

Bancorp.  Fannie Mae, which later purchased the Villares loan from CMI,

discovered that Villares actually owned a medical practice called Minimally

---

[10]  Chicago Bancorp appears to argue that the additional mortgages were from properties Perez
rented to others, and that the rental income he received from these properties – also undisclosed
– assuaged Perez's monthly mortgage debt.  Though it is theoretically possible that a borrower's
rental income and mortgages might cancel each other out, Chicago Bancorp has not documented
the amount of rental income Perez allegedly received.

Invasive Surgical Consultants. Under Fannie Mae's guidelines, a borrower "who has a 25 percent or greater ownership interest in a business" is self-employed. (*See* Doc. 99-123, Pl.'s Ex. N7, p. 6.) Self-employed borrowers are subject to more stringent employment and income verifications than borrowers who are not self-employed. (*See id.*) Because those verifications were not part of Villares' loan application file, Fannie Mae compelled CMI to repurchase the loan. In turn, CMI demanded Chicago Bancorp repurchase the loan, which it has not done.

Both CMI and Chicago Bancorp have moved for summary judgment on the Villares loan. CMI argues the Villares loan was defective because it misrepresented the borrower's employment and because CMI was required to repurchase it from Fannie Mae.[11] Further, when the offending income was removed, the loan failed to meet the applicable debt-to-income ratio limit.

For its part, Chicago Bancorp argues first that any defects were an "underwriting deficiency" and because it was no longer underwriting loans it sold to CMI by this time, it did not breach the Agreement by failing to repurchase the loan. For the same reasons I stated earlier with regard to the Curtis loan, Chicago

---

[11] As I have stated before, the fact that CMI was compelled to repurchase a loan from a secondary investor is a derivative defect. Repurchase alone does not require Chicago Bancorp to take the loan back. Rather, only repurchase due to Chicago Bancorp's breach of the Agreement or the CMI Manual warrants repurchase under the Agreement.

Bancorp was subject to the "Cure and Repurchase" provision of the Agreement even though it did not underwrite the Villares loan, so this argument has no merit.

Chicago Bancorp next argues that it promulgated a request for admission on CMI that read: "Admit that you do not know the percentage of ownership of Minimally Invasive Surgical Consultants, PLC that [borrower] Villares held at the time of the application for, or at the time of the closing of, the Villares Loan, or at the time you purchased the Villares Loan."  CMI objected to the request for admission for various reasons, then stated:

> Subject to and without waiving its objections, CMI states that, after reasonable inquiry, it is unaware of facts that would establish the assumption that "[borrower] Villares held" a "percentage of ownership of Minimally Invasive Consultants, PLC . . . at the time of the application for, or at the time of the closing of, the Villares Loan, or at the time you purchased the Villares Loan" on which this Request is premised and has no basis on which to conclude that such assumption is accurate; therefore, CMI is unable to admit or deny the Request.

(Doc. 61-36, Def.'s Ex. U, pp. 19–20.)  According to Chicago Bancorp, this is conclusive evidence of CMI's bad faith in demanding repurchase.

Although CMI's response to the RFA was evasive,[12] it does not constitute an admission that CMI had no basis for a good-faith belief that Villares was self-

---

[12] Under Fed. R. Civ. P. 26(g), a party's attorney must certify that an objection or discovery response is "complete and correct as of the time it is made," among other things.  The record makes clear that CMI *does* know that Villares owned a percentage of Minimally Invasive

employed. In fact, CMI did not admit anything at all. The uncontroverted

evidence, including Villares' bankruptcy petition (Doc. 99-122, Pl.'S Ex. N6, pp.

4, 23), demonstrates that under Fannie Mae's expansive definition of self-

employment, Villares was self-employed at the time he closed on his mortgage

loan. Chicago Bancorp has not submitted evidence of CMI's bad faith in so

concluding.

But in order to prevail on summary judgment, CMI must show not only that

Villares was self-employed but that it determined "in its sole and exclusive

discretion" that the loan somehow failed to comply with the Agreement. CMI does

not clearly identify which of the "Cure or Repurchase" provisions the Villares loan

fails to meet. At one point, it argues that Villares's representation of his employer

as Sunwest Employer Services was a material misrepresentation. Under Arizona

law, Sunwest is considered a co-employer, *see* Ariz. Rev. Stat. § 23-561, so it is

not clear that Villares made a misrepresentation at all, much less a material one.

CMI does not provide any evidence that Villares was required to provide the

names of both his employers on his application.

CMI also argues that a loan to a self-employed borrower is subject to more

rigorous income verification requirements under Fannie Mae guidelines, and the

---

Consultants, which is the very reason CMI had demanded repurchase. Its response to Chicago
Bancorp's request for admission was nonsensical.

uncontroverted evidence it submits shows this is true. (Doc. 99-123, Pl.'s Ex. N7, p. 6.) Chicago Bancorp's failure to include the appropriate documents verifying Villares' income could require repurchase if the loan "was underwritten and/or originated in violation of any term, condition, requirement or procedure contained in this Agreement or the CMI Manual." CMI has not precisely identified what verification the loan package failed to include. In its final demand letter to Chicago Bancorp, CMI indicated that "Fannie Mae's guidelines require a minimum of two year history of self employment and should be documented with two years' personal tax returns." (Doc. 99-118, Pl.'s Ex. N2, p. 1.) But the guidelines themselves, also submitted by CMI, belie this conclusion. They provide only that: "Because income from self-employment may be unpredictable and the business owner often is personally liable for the business debt, self-employed borrowers tend to default at a much higher rate than other borrowers. For this reason, we *usually* require the lender to obtain a two-year history of the borrower's prior earnings . . . . However, a person who has a shorter history of self-employment—12 to 24 months—may be considered" under certain circumstances. (Doc. 99-123, Pl.'s Ex. N7, p. 6 (emphasis added)).

As noted, the Fannie Mae guidelines, incorporated into the Agreement, are not a picture of clarity. Despite their ambiguity, I find that CMI is entitled to

summary judgment on the Villares loan because Chicago Bancorp has not provided any evidence of bad faith. CMI did not have to be correct in its determination that the Chicago Bancorp breached the Agreement. It only needed to base that determination on what it knew. The uncontroverted evidence shows that it did that much, so it is entitled to summary judgment on this loan.

## *Wade loan*

Both parties have moved for summary judgment on the Wade loan, which CMI purchased from Chicago Bancorp, then resold to Fannie Mae. Eventually – like for the McDonald loan – the mortgage insurer rescinded coverage because it found the Wade borrower had not contributed at least $500 of his own funds to the transaction. Because mortgage insurance is a Fannie Mae requirement and the loan had lost coverage, Fannie Mae compelled CMI to repurchase the loan. In turn, CMI demanded that Chicago Bancorp repurchase the loan, which it has not done.

Chicago Bancorp argues that Wade had, in fact, contributed $500 of his own funds to the transaction. As evidence, it offers the HUD-1 settlement statement, its own calculations, and an affidavit from Chicago Bancorp president John Calk explaining why Wade's contributions add up to more than $500. CMI counters that Wade did not contribute at least $500, and even if he did, that his contribution was not verified in the loan file in the required way.

– 40 –

The evidence suggests that the Wade loan had a 100% loan-to-value ratio (*see* Doc. 99-137, Pl.'s Ex. O8). Because the loan was sold to CMI under the Fannie Mae Flexible Mortgage 97/100 program, Wade could make a 3% contribution or had "the option of contributing $500 from [his] own funds to the transaction." As set out above with regard to the McDonald loan, the Fannie Mae guideline required that there be proof that the funds actually came from the borrower. Chicago Bancorp contends that Wade's $2,000 earnest money payment should suffice under the guideline and has produced a copy of his check. But the earnest money payment was made by cashier's check. The check was purchased by Wade (*see* Doc. 115-3), but it does not identify Wade's bank account or other assets as the source of funds.[13] Although Chicago Bancorp has also produced a receipt from the realty company to which Wade paid the earnest money, it does not constitute a letter from the holder of the deposit attesting that it came from Wade's own funds and is therefore not an adequate alternative under the guideline.

Chicago Bancorp argues that these are two separate theories of recovery: (1) whether Wade's loan file contained an acceptable verification of the source of funds for his contribution at closing and (2) whether Wade made a $500 contribution at all, based on the HUD-1 settlement statement. Chicago Bancorp

---

[13]  In contrast, the McDonalds' canceled check was drawn on their personal bank account.

contends that CMI should not be permitted to recover under the first theory when its letters of demand only referenced the second theory. But both theories of recovery are well within the scope of CMI's original complaint, in which CMI pled that the Wade loan "was underwritten in violation of program requirements." (Doc. 1, ¶ 43.)

Because the Wade loan was originated in violation of the Fannie Mae guideline, which was incorporated into the Agreement, CMI was permitted to demand repurchase. It is undisputed that Chicago Bancorp has failed to repurchase the loan. Therefore, CMI is entitled to summary judgment on the Wade loan.

## VI.   **Damages**

The Agreement provided that upon notification from CMI that a loan was defective, Chicago Bancorp would "correct or cure" the defect within the time prescribed by CMI and to CMI's "full and complete satisfaction." (Doc. 99-3, Pl.'s Ex. B, ¶ 11.) Under the Agreement, if Chicago Bancorp was unable to correct or cure the defect within the prescribed time, it would:

> at CMI's sole discretion, either (i) repurchase such defective Loan from CMI at the price required by CMI ("Repurchase Price") or (ii) agree to such other remedies (including but not limited to additional indemnification and/or refund of a portion of the Loan purchase price) as CMI may deem appropriate.

(*Id.*)  CMI has demanded that Chicago Bancorp pay the Repurchase Price for each

of the defective loans.

> The CMI Manual defines the Repurchase Price as the sum of:
>
> (i) the current principal balance on the loan as of the paid-to date;
> (ii) the accrued interest calculated at the mortgage loan Note rate from the mortgage loan paid-to date up to and including the repurchase date;
> (iii) all unreimbursed advances (including but not limited to tax and insurance advances, delinquency and/or foreclosure expenses, etc.) incurred in connection with the servicing of the mortgage loan;
> (iv) any price paid in excess of par by CitiMortgage on the funding date[;] and
> (v) any other fees, costs, or expenses charged by or paid to another investor in connection with the repurchase of the mortgage loan from such investor but only to the extent such fees, costs and expenses exceed the total of items (i) through (iv) above.

(Doc. 99-8, Pl.'s Ex. C, p. 97.)

Chicago Bancorp does not appear to dispute CMI's calculation of the

Repurchase Price for each loan.  But for five of the loans – Bennett, Brown,

Gelatka, McDonald, and Miller – Chicago Bancorp contends that the Repurchase

Price is only a "starting point" for determining the appropriate measure of

damages.  For these five loans, argues Chicago Bancorp, CMI either still owns the

properties, waited too long sell them off, or refused to accept deeds-in-lieu-of-

foreclosures that would have slowed the decline in the properties' value.  Chicago

Bancorp argues that CMI's handling of the loans in such a manner was not

"reasonably foreseeable" at the time it signed the Agreement, so it cannot be liable for damages resulting from CMI's actions. Furthermore, according to Chicago Bancorp, some of CMI's actions amounted to a failure to mitigate damages.

None of Chicago Bancorp's arguments can succeed. The Agreement represents an arm's length accord between two sophisticated commercial entities, under which Chicago Bancorp agreed to pay the Repurchase Price for defective loans it could not cure. Although CMI's feet-dragging may have led to increased damages under the Repurchase Price, CMI had already contracted to avoid this risk, and Chicago Bancorp had contracted to assume it. There may be other ways to calculate the damages CMI incurred because of Chicago Bancorp's breach of the Agreement, but this is the measure the parties agreed to. The damages incurred by CMI were not unforeseeable; rather, they were explicitly bargained for. *See CitiMortgage, Inc. v. Allied Mortgage Grp., Inc.*, 4:10CV1863 JAR, 2012 WL 5258745, at *13 (E.D. Mo. Oct. 24, 2012); *CitiMortgage, Inc. v. Reunion Mortg., Inc.*, 4:10CV1632 RWS, 2012 WL 5471165, at *13 (E.D. Mo. Nov. 9, 2012). As such, CMI is entitled summary judgment in the amount of the Repurchase Price for the Bennett, Brown, Curtis, Hansen, Maggio, Miller, Perez, Villares, and Wade loans. This amounts to $1,595,208.63. CMI still owns two of the properties securing the mortgage loans at issue: the Brown and Wade properties. In

accordance with Section 11 of the Agreement, CMI must release to Chicago

Bancorp its interest in those properties upon receipt of the Repurchase Price.

## VII.   Motion to Exclude Expert Testimony

CMI has moved to exclude testimony from Chicago Bancorp president John

Calk, whom Chicago Bancorp has designated as an expert.  In addition to his

testimony as a fact witness, Calk is expected to testify as an expert that: (1)

because CMI did not require third-party verification of borrower income, income

was not material to CMI's loan purchasing decisions, and (2) industry custom and

practice is to give credit at closing toward a borrower's minimum required

contribution for the seller's share of prorated property taxes when the taxes are

paid in arrears.

In light of my holdings in this Memorandum and Order, I will deny as moot

CMI's motion to exclude.  Neither of these topics is related to the remaining loans

at issue.  Although Chicago Bancorp argued that, for the McDonald loan, the

borrowers' tax payments should count toward the $500 required contributions,

whether the borrowers provided $500 at closing is not the dispositive issue.

Rather, it is whether the McDonald loan file contained a canceled check (or

acceptable alternative under the applicable guideline) showing that the contribution

came from the borrowers' own funds.  If Calk has personal knowledge of the

contents of the McDonald loan file, he remains free to testify about that as a fact witness, but none of his proffered expert testimony is relevant to any issues remaining for trial.

**VIII.** <u>**Conclusion**</u>

There are no genuine issues of material fact and CMI is entitled to judgment as a matter of law that Chicago Bancorp breached the Agreement by failing to repurchase the Bennett, Brown, Curtis, Hansen, Maggio, Miller, Perez, Villares, and Wade loans. As for the two remaining loans, Gelatka and McDonald, Chicago Bancorp has submitted sufficient evidence to create a triable issue of fact about CMI's bad faith in determining that the loans were defective for one of the reasons enumerated in the Agreement.

Accordingly,

**IT IS HEREBY ORDERED** that defendant Chicago Bancorp's motion for partial summary judgment [#50] is denied.

**IT IS FURTHER ORDERED** that plaintiff Citimortgage, Inc.'s motion for summary judgment [#97] is granted as to the Bennett, Brown, Curtis, Hansen, Maggio, Miller, Perez, Villares, and Wade loans, and is denied as to the Gelatka and McDonald loans.

**IT IS FINALLY ORDERED** that plaintiff's motion to exclude purported expert testimony [#91] is denied as moot.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this <u>31st</u> day of March, 2014.